# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:
**GUANTANAMO BAY**
 **DETAINEE LITIGATION**

Misc. No. 08-442 (TFH)
Civil Action Nos.
02-CV-0828, 04-CV-1136, 04-CV-1164,
04-CV-1194, 04-CV-1254, 04-CV-1937,
04-CV-2022, 04-CV-2035, 04-CV-2046,
04-CV-2215, 05-CV-0023, 05-CV-0247,
05-CV-0270, 05-CV-0280, 05-CV-0329,
05-CV-0359, 05-CV-0392, 05-CV-0492,
05-CV-0520, 05-CV-0526, 05-CV-0569,
05-CV-0634, 05-CV-0748, 05-CV-0763,
05-CV-0764, 05-CV-0833, 05-CV-0877,
05-CV-0881, 05-CV-0883, 05-CV-0889,
05-CV-0892, 05-CV-0993, 05-CV-0994,
05-CV-0995, 05-CV-0998, 05-CV-0999,
05-CV-1048, 05-CV-1124, 05-CV-1189,
05-CV-1220, 05-CV-1236, 05-CV-1244,
05-CV-1347, 05-CV-1353, 05-CV-1429,
05-CV-1457, 05-CV-1458, 05-CV-1487,
05-CV-1490, 05-CV-1497, 05-CV-1504,
05-CV-1505, 05-CV-1506, 05-CV-1509,
05-CV-1555, 05-CV-1590, 05-CV-1592,
05-CV-1601, 05-CV-1602, 05-CV-1607,
05-CV-1623, 05-CV-1638, 05-CV-1639,
05-CV-1645, 05-CV-1646, 05-CV-1649,
05-CV-1678, 05-CV-1704, 05-CV-1725,
05-CV-1971, 05-CV-1983, 05-CV-2010,
05-CV-2083, 05-CV-2088, 05-CV-2104,
05-CV-2112, 05-CV-2185, 05-CV-2186,
05-CV-2199, 05-CV-2200, 05-CV-2249,
05-CV-2349, 05-CV-2367, 05-CV-2371,
05-CV-2378, 05-CV-2379, 05-CV-2380,
05-CV-2381, 05-CV-2384, 05-CV-2385,
05-CV-2386, 05-CV-2387, 05-CV-2398,
05-CV-2444, 05-CV-2477, 05-CV-2479,
06-CV-0618, 06-CV-1668, 06-CV-1674,
06-CV-1684, 06-CV-1688, 06-CV-1690,
06-CV-1691, 06-CV-1758, 06-CV-1759,
06-CV-1761, 06-CV-1765, 06-CV-1766,
06-CV-1767, 07-CV-1710, 07-CV-2337,
07-CV-2338, 08-CV-0987, 08-CV-1085,
08-CV-1101, 08-CV-1104, 08-CV-1153,

08-CV-1185, 08-CV-1207, 08-CV-1221,
08-CV-1222, 08-CV-1223, 08-CV-1224,
08-CV-1227, 08-CV-1228, 08-CV-1229,
08-CV-1230, 08-CV-1231, 08-CV-1232,
08-CV-1233, 08-CV-1234, 08-CV-1235,
08-CV-1236, 08-CV-1237, 08-CV-1238,
08-CV-1310, 08-CV-1360, 08-CV-1440

**RESPONDENTS' MOTION FOR PARTIAL AND TEMPORARY RELIEF
FROM THE COURT'S JULY 11, 2008 SCHEDULING ORDER**

For the reasons stated herein, Respondents respectfully request that they be excused from

the requirement of the Court's July 11, 2008 Scheduling Order (Misc. No. 08-0442) (dkt. no. 53)

that respondents produce 50 factual returns by August 29, 2008.  Respondents have already filed

eight factual returns this month in cases pending before Judges Leon and Sullivan and are filing

today an additional 14 returns, 10 in cases before this Court and 4 in cases before Judge Sullivan,

for a total of 22 returns filed this month, as indicated in the chart attached as Exhibit A.   Further,

Respondents expect to file additional returns next week.  As explained in detail below and in the

public and *in camera*, *ex parte* declarations of the Director of the Central Intelligence Agency

submitted herewith,[1] despite diligent and ongoing efforts, Respondents have been unable to

complete the filing of 50 factual returns in No. 08-442 in light of significant, national security

related complexities encountered in the start-up of the interagency process of developing factual

returns in these extraordinary cases.  Respondents deeply regret that they have been unable to

complete the initial set of factual returns in the time-frame originally anticipated.  Respondents

respectfully seek an additional 30 days to complete the process needed to reach the full

production rate of 50 factual returns per month in these cases.  As set forth below, Respondents

have completed numerous factual returns to date, and are well underway to completing the first

set of 50 returns required by the Court's scheduling order.  Respondents will have completed the

production of the first 50 factual returns on a rolling basis before the end of September, and hope

to achieve that rate of production each month thereafter.

---

[1] Director Hayden's *in camera*, *ex parte* declaration has been filed through the Court
Security Officer.

## OVERVIEW

As a result of the Supreme Court's decision in *Boumediene v. Bush*, __ U.S. __, 128 S. Ct. 2229 (2008), the United States, for the first time in its history, has had to defend, on the merits, habeas corpus proceedings by or on behalf of individuals detained as enemy combatants by the military overseas. Further, the Government is faced with defending such proceedings *en masse*, with over 250 such proceedings pending, and on an expedited basis. Defending these cases requires an intense inter-agency coordination of efforts. None of the relevant agencies, however, was prepared to handle this volume of habeas cases on an expedited basis when *Boumediene* was decided on June 12, 2008. In the weeks that followed, based on direction from this Court, each agency began rapidly deploying resources to dedicate to this important task, as set forth below. That effort, however, took substantial time – not only to obtain the authorizations needed to redirect employees from their other responsibilities – but also to obtain needed security clearances. Specifically, the Department of Justice ("DoJ"), Department of Defense ("DoD"), the Federal Bureau of Investigation ("FBI"), and the Central Intelligence Agency ("CIA"), have undertaken extraordinary steps in marshaling resources and appropriate personnel, developing processes for gathering and reviewing information, developing pertinent information into a factual return, and vetting such information for use in proceedings in this Court.

As part of this process, all of these agencies began efforts to establish a coordinated plan and system for assembling and reviewing information and developing factual returns, including declarations supporting such returns, appropriate for use in Court. Factual returns are necessarily built upon reports and other materials which are commonly used to disseminate

- 2 -

intelligence to decision-makers throughout the United States Government.  These source documents are created in the ordinary course of military, law enforcement, and intelligence operations by various agencies, including DoD, CIA, and FBI.  Given their nature, these products are classified and their dissemination is strictly controlled.

As the Court is aware, the volume of cases is daunting and the very nature of the proceedings in most of these cases, including issues such as the quanta and burdens of proof and applicable legal standards, remains unsettled.  Processing this sheer volume of cases, with these uncertainties, on a compressed time-frame is inherently challenging, but, as explained below, the task has proven even more difficult than originally envisioned because of the pervasiveness of classified information throughout the relevant records and the need for classified information in presenting the Government's case.  Even once draft factual returns are prepared, they require extensive review for consideration of whether the classified information in the draft returns are appropriately used in court.  Respondents simply did not appreciate the full extent of the challenges posed by the extensive need for classified information in these cases when they proposed to complete the first set of factual returns by the end of August.  As explained in the public and *in camera*, *ex parte* declarations of CIA Director Hayden, the CIA's review of classified information can take up to 30 days.  Because both DoJ and DoD were assembling staff and resources over the month of July, and DoJ began producing the first set of draft factual returns throughout the month of August, that left little time for the CIA's review of sensitive classified information.

Respondents apologize for failing to meet the Court's August 29 deadline.  The Government failed to recognize the full extent of the challenges presented in handling these cases

on an expedited fashion and the particular challenges presented by the use of classified

information. The full extent of those challenges with respect to attempts to complete the first 50

returns only recently became apparent. We expect to finish production of the first 50 returns on a

rolling basis throughout September, and hope to achieve production of returns at that rate each

month thereafter.

**RESOURCES AND EFFORT DEVOTED TO PREPARING THE FACTUAL RETURNS**

1.     **Department of Defense**

As noted above, the efforts required to put resources in place to process this volume of

cases have been daunting for each of the Federal agencies involved. Following this Court's

scheduling order, DoD began detailing attorneys from throughout the Defense Department to

work on the habeas litigation. *See* Declaration of Daniel J. Dell'Orto ¶ 3 (attached as Exhibit B).

The first of these attorneys arrived in mid-July. *Id*. At present approximately 30 attorneys at

DoD are working exclusively on these matters. *Id*. DoD is continuing to hire attorneys and

support staff, and anticipates deploying over 50 attorneys and support staff to these cases. *Id*. ¶ 3

& n.1.

DoD attorneys have been actively involved in gathering and reviewing information for

potential use in the factual returns, including intelligence and law enforcement materials that may

have originated with DoD or other agencies. *Id*. ¶¶ 4-5. Once a DoD attorney assigned to a case

has assembled documents for review, they work directly with attorneys from DoJ also assigned to

the case. *Id*. ¶ 4. DoD has also diverted intelligence personnel to work full-time in support of

the habeas litigation. *Id*. ¶ 4. In addition DoD has created a team of personnel responsible for

seeking use authorization from relevant DoD components. *Id*. ¶ 6. Within the past 30 days, that

- 4 -

team has reviewed nearly 1,900 DoD documents (most of them being multi-page documents) for use in the habeas litigation and assisted in developing other supporting documents for the litigation.  *Id*.  ¶ 7.

### 2.    Department of Justice

Until the Supreme Court's decision in *Boumediene*, DoJ could take only limited steps to prepare for the defense of habeas claims by detainees held at Guantanamo Bay.  *See* Declaration of Gregory G. Katsas ¶ 4 (attached as Exhibit C).  After *Boumediene* was decided, DoJ committed to assigning or detailing at least 50 attorneys to be dedicated to producing factual returns and litigating the more than 250 habeas cases.  *Id*. ¶ 5.  A Department-wide initiative was undertaken to identify and shift this team of attorneys from other responsibilities.  *Id*.  Even before these new attorneys began to arrive, the Civil Division began converting office space it had previously located to house the team to accommodate information technology and other document production resources suitable to the processing of classified information that would form the primary basis of the anticipated returns.  *Id*. ¶ 6.  Further modification and outfitting of facility resources continues to the present.  *Id*.

To date, DoJ has detailed or assigned to the factual return effort more than 50 attorneys from its Washington, D.C., components and the U.S. Attorneys' Offices.  *Id*. ¶ 7.  The first such detailees arrived in July, and a number of others have reported for the detail throughout the month of August.  *Id*.  As a practical matter, however, attorneys must clear two distinct hurdles to work on cases of this nature, which entail reviewing significant amounts of classified

information: a security clearance and access to the secure processing system. *Id.* Once attorneys

are detailed to the litigation team, it can take several weeks to obtain such clearance and access.[2]

In crafting a factual return, DoJ and DoD attorneys begin by analyzing the information

about a detainee and by reviewing documents for information that supports the detention (or that

is exculpatory, as that term is understood in this context), and then draft a narrative to attach to

the supporting documents that serves as a summary for the Court and counsel substantiating a

detainee's status and detention as an enemy combatant. *Id.* ¶ 9. The development of an initial

draft return for a detainee and set of supporting materials involve, at the least, the investment of

dozens of man-hours and the review of hundreds of pages of documents and sometimes far more.

*Id.* Collectively, thousands of man-hours have been expended by those directly involved in this

factual return development effort in just the last two months. *Id.* Once classified documents are

identified as being needed for use, DoJ or DoD contacts the originating agencies to seek

clearance for use. *Id.* ¶ 10.

After DoJ receives from the originating agencies responses to its clearance requests,

attorneys crafting the return must undertake to finalize the returns. *Id.* ¶ 11. In certain cases,

however, clearance for use of sensitive information may be central to producing a given habeas

return. If clearance of such documents is denied, attorneys producing the return must re-evaluate

the case, attempt to identify alternate sources of the information that do not implicate sensitive

intelligence equities, and determine a course of action without using the restricted material.

---

[2] Thus, although DoJ now has almost 40 attorneys with security clearances working full time on these cases, throughout the month of August an average number of approximately 20 cleared attorneys have been available for the effort. By late September, DoJ expects to have at least 50 cleared attorneys working full-time on the cases before this Court. Katsas Decl. ¶ 7.

These decisions cannot be completed – indeed, the need to make such decisions does not become apparent – until the initial clearance requests are processed.  *Id.*

To expedite the document clearance process, DoJ and DoD began sending exhibit lists associated with draft returns to the CIA in late July and early August.  *Id.* ¶ 12.  These lists identified the proposed supporting documents for individual draft returns.  Shortly thereafter, on or about August 12, DoJ began sending complete packets of draft factual returns on a rolling basis to the CIA for document clearance.  To date, DoJ has completed, and CIA has received, draft factual returns pertaining to 59 petitioners in these cases and those before Judges Leon and Sullivan.  *Id.*

3.      **Central Intelligence Agency**

CIA Director Hayden has made meeting the Court's schedule a top priority for the Agency and has allocated additional personnel to those components involved in the habeas review process.  *See* Declaration of Michael V. Hayden ¶ 6 (attached as Exhibit D).  CIA presently has more than fifty attorneys, paralegals, subject matter experts, and classification officials involved in the habeas review process.  *Id.* ¶ 6 n.1.

As noted by Director Hayden, much of the information upon which DoD relied in making its enemy combatant determinations, and upon which DoJ proposes to rely in the factual returns derives from classified CIA intelligence reports.  *Id.* ¶ 8.  The release of classified information outside of the Executive Branch, either to the Court, or to cleared counsel must be assessed by subject-matter experts, to determine whether it would potentially damage the national security.  *Id.* ¶ 9.  To accommodate detainees' counsel as much as possible, the Government has sought – with rare exception – to rely only on materials that have been authorized for release to the

detainee's cleared counsel in defending a case. The considerations weighed in determining what material may be released are detailed further below, in the public declaration of Director Hayden, and in greater detail in his *in camera*, *ex parte* declaration. In addition, Director Hayden is willing to appear before the Court to provide additional information or to answer any questions on an *ex parte* basis, so that he may elaborate on the issues described in his classified declaration. *See id*. ¶ 20.

CIA began receiving and reviewing documents to be included in factual returns in late July and early August, and received the first sets of completed draft factual returns on August 12. It has continued to receive draft factual returns throughout August. *See id*. ¶ 19. To date, CIA has completed its clearance review for a total of 19 draft factual returns. Based on its initial efforts, CIA expects to be able to complete its review of a draft factual return within 30 days of receipt. *See id*. With the benefit of increased production of draft factual returns now that DoJ's habeas team is more fully staffed, and lessons learned in working with the first sets of factual returns, CIA expects to be able to increase its rate of review towards accommodating the Court's schedule of 50 returns per month. *See id*. Because, however, CIA needs 30 days to review and respond to draft factual returns, and because DoD and DoJ were not able to begin substantially providing draft factual returns until August, Respondents are essentially 30 days behind the Court's schedule.

## REVIEW OF CLASSIFIED INFORMATION FOR USE IN THESE CASES

As explained in the public and *ex parte* declarations of Director Hayden, the release of classified information always, by definition, risks harm to the national security. *See* Hayden Decl. ¶ 8. To minimize the risk of harm, such release is governed by several considerations,

including the classification level of the information, the receiving party's clearance and need to know the information, and the potential harm to sensitive sources or methods of intelligence that might be implicated. *See generally* Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003) (Exec. Order 12958, as amended). Expertise on such matters, including potential harms from dissemination and "need to know" pertaining to such materials, rest with the agencies that "own" or classified the materials; thus, those agencies must be consulted on whether and how to authorize release of their information if it is proposed to be included in a factual return. Thus, any decision for the Government to rely upon a particular piece of classified information in defending these habeas cases, and the decision to share that information with opposing counsel, requires extensive review for national security concerns by the agency or agencies which classified the information. The majority of information in this context is controlled by three national security agencies: CIA, DoD, and FBI. In essence, each agency must clear the information contained in its products, or those of other agencies that incorporate those products, for release to the detainee's cleared counsel (and thus to the Court).

For DoD and the FBI, decisions about whether to authorize the release of sensitive information may begin once the documents to be used are identified and the narrative is being drafted. For the CIA, this process begins once the narrative is drafted and the documents to be used are identified and provided to the Agency, such that the Agency can see the context of intended use. Moreover, CIA must review virtually every classified document involved in these cases, regardless of the apparent origination of that document, to determine whether its dissemination outside the Executive Branch would implicate national security concerns not immediately apparent to the other agencies involved in the process. For reasons described in the

public and *ex parte* declarations of Director Hayden, the Agency might determine that certain information cannot be released to the detainee's counsel, and thus it is generally not provided to counsel or the Court in a factual return. There are a limited number of CIA subject matter experts who can undertake such assessments. *See* Hayden Decl. ¶ 13. Until such decisions are made, however, DoJ cannot finalize a factual return or file it with the Court. Because of the sheer volume of classified information involved in these cases, filing a return consisting solely of unclassified documents would not provide an appropriately full account of the basis for detention and would not materially assist either petitioners or the Court.

Indeed, the issues involved in clearing documents for use in these habeas proceedings are akin to the consideration and weighing the Government must engage in when choosing between protecting sensitive information or forgoing a prosecution or civil action or remedy. Of course, these cases are neither prosecutions nor affirmative cases by the Government; rather, the Government is responding to challenges to the legality of detention. This inherently requires balancing the national security interests in preventing inappropriate dissemination of sensitive classified information with the national security interests arising from not including particular information in a given detainee's case, thus perhaps substantially weakening the case for detention. These sensitive decisions must often be made on a document-by-document, line-by-line basis. *See* Katsas Decl. ¶ 13; Hayden Decl. ¶ 13.

## RESPONDENTS' REQUEST FOR RELIEF

The Government is keenly aware of the need for expedition in these cases and of the disruption in the Court's planned schedule in the cases and deeply regrets that the schedule has not been met this month. The Government has proceeded with diligence and in good faith, and

- 10 -

has undertaken extraordinary efforts in this unprecedented situation to attempt to meet its goal

and this Court's requirement of 50 returns per month, including, as explained *supra*, drafting 59

factual returns for clearance decision, which reflects the sheer volume of work that has been

completed to date.[3]  Attorneys and others from multiple agencies have worked long and hard,

nights and weekends, under the difficult logistical challenges inherent in working with classified

information.  Nonetheless, the Government is compelled to seek partial and temporary relief

from the 50-return-per-month requirement as it works toward meeting that requirement.

Although the Supreme Court in *Boumediene* noted that detainee habeas proceedings should occur

expeditiously, the Court did not say that inappropriate burdens on national security should be

borne by the American public.  Such burdens are distinctly possible if the sensitive balancing of

national security interests involved in the clearance and use issues discussed *supra* and in the

declarations of Director Hayden is shortchanged.

    The Court also should be aware that the Government is taking steps to streamline and

improve the process related to vetting of factual returns for use in court going forward.  Many of

these efforts are outlined in the declarations of Director Hayden, and the increase in the number

of available, security-cleared personnel at DoD and DoJ should permit a build-up of a queue of

---

[3] While engaged in the resource ramp-up and factual return development effort over the last two months, respondents have also made numerous other filings and appearances in these Guantanamo cases.  For example, respondents have been required to file hundreds of status reports and engage in docket clean-up efforts and negotiations; have appeared in over two dozen status conferences or other hearings before this Court or other Judges of the Court; have filed briefing on procedural framework issues and responded to a number of detainee medical care or other conditions of confinement issues; have provided various records to opposing counsel as ordered by the Court; and have undertaken to address special accommodations of certain Chinese Uighur detainees at Guantanamo consistent with discussions with Judge Urbina in the cases before him, all the while also dealing with advance notice and other issues associated with the transfer of several detainees.

draft returns so as permit the clearance process to go forward and produce a number of returns approaching the 50 per month requirement soon. CIA has explained in its declaration that it needs 30 days from the date that a draft factual return is provided by DoJ to complete its clearance review. Thus, because dozens of draft factual returns already have been provided to CIA, we expect to file completed returns on a rolling basis on a substantially increasing rate. Approximately 50 returns (those due today and others) can be filed on a rolling basis throughout the month of September, beginning as early as next week, and with an extra month of lead-time, we hope to produce returns at that rate in future months. The difficulties to date have been part of a learning process in an unprecedented and exceedingly complex undertaking in a new area of law. Lessons learned are being incorporated into the factual return development process in order to attempt to avoid from the outset use of information that would likely give rise to security concerns and hinder timely filing of returns.

The Government will continue to strive to meet the 50-per-month requirement. However, in light of the challenges associated both with starting up the factual return development process and with the substantive issues encountered in executing that process, and the inherent complexity and sensitivity in reviewing and processing classified information for release to persons outside of the Executive Branch, Respondents anticipate filing by today a total of 22 returns, as indicated in the chart attached as Exhibit A. Further, Respondents anticipate filing several returns next week and additional returns on a rolling basis throughout the month of September. The shortfall in the number of returns filed this month and the deviation in the ordered sequencing reflects primarily the clearance issues discussed above, but also several special or unique difficulties and complications regarding specific cases, preventing the filing of

- 12 -

factual returns in those cases.[4]  Including those filed today, Respondents anticipate filing at least 50 factual returns by the end of September, and hope to continue at that rate each month thereafter.

*  *  *

For the foregoing reasons, the Government respectfully requests that the Court modify its July 11, 2008 Scheduling Order to relieve Respondents from the requirement that 50 factual returns be produced by August 29, 2008.  Such relief will give Respondents the additional 30 days of lead time needed due to the complexity and national security sensitivities of these cases to produce 50 returns by the end of September.

Dated: August 29, 2008                    Respectfully submitted,

                                          GREGORY G. KATSAS
                                          Assistant Attorney General

                                          JOHN C. O'QUINN
                                          Deputy Assistant Attorney General

---

[4] Respondents are continuing efforts to resolve those issues to permit filing of a return in those cases at the soonest possible date.  In addition, because Respondents misunderstood the Court's intentions regarding processing of factual returns for petitioners who have been approved by DoD for transfer or release from Guantanamo, *see* July 11 Scheduling Order ¶ 2.E, such petitioners were not included for processing of factual returns in August.  Those petitioners will be included going forward and processed consistent with sequencing established in the July 11 Scheduling Order.

_/s/ Terry M. Henry_
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
ANDREW I. WARDEN
PAUL AHERN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107

Attorneys for Respondents

- 14 -

**Amended and Other Factual Returns Filed – August 2008**

| Case No. | Judge | Petitioner | ISN | Return Type | Date Filed |
|---|---|---|---|---|---|
| 04-1194 | HHK/TFH | Al Swidhi | 578 | Amended | 8/29/08 |
| 04-1194 | | Al Haj | 256 | Amended | 8/29/08 |
| 04-1194 | | Amer | 564 | Amended | 8/29/08 |
| 04-1194 | | Al Baidhani | 553 | Amended | 8/29/08 |
| 04-1254 | HHK/TFH | Al Wrafie | 117 | Amended | 8/29/08 |
| 05-247 | HHK/TFH | Al-Mohammed | 537 | Amended | 8/29/08 |
| 05-280 | GK/TFH | Bawazir | 440 | Amended | 8/29/08 |
| 05-526 | RMU/TFH | Tumani | 312 | Amended | 8/29/08 |
| 05-764 | CKK/TFH | Nasser | 244 | Original | 8/29/08 |
| 05-763 | JDB/TFH | Hamlily | 1452 | Original | 8/29/08 |
| | | | | | |
| 05-409 | EGS | Batarfi | 627 | Amended | 8/12/08 |
| 05-765 | EGS | Habashi | 1458 | Amended | 8/12/08 |
| 05-1234 | EGS | Ahmed | 703 | Original | 8/29/08 |
| 05-2384 | EGS | Al Sharbi | 682 | Original | 8/29/08 |
| 08-1222 | EGS | Sharifullah | 944 | Original | 8/29/08 |
| 06-1725 | EGS | Al Shibh | 10013 | Original | 8/29/08 |
| | | | | | |
| 04-1166 | RJL | Bensayah | 10001 | Amended | 8/22/08 |
| 04-1166 | | Lahmar | 10002 | Amended | 8/22/08 |
| 04-1166 | | Nechle | 10003 | Amended | 8/22/08 |
| 04-1166 | | Idir | 10004 | Amended | 8/22/08 |
| 04-1166 | | Boumediene | 10005 | Amended | 8/22/08 |
| 04-1166 | | Boudella | 10006 | Amended | 8/22/08 |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                         |   |                      |
|-------------------------|---|----------------------|
| IN RE:                  | ) |                      |
|                         | ) | MISC. NO. 08-0442    |
| GUANTANAMO BAY          | ) |                      |
| DETAINEE LITIGATION     | ) |                      |
|                         | ) |                      |
|                         | ) |                      |
|                         | ) |                      |

## DECLARATION OF DANIEL J. DELL'ORTO

I, Daniel J. Dell'Orto declare as follows:

1.  I am the Acting General Counsel for the Department of Defense ("DoD"). The statements contained in this declaration are based on my personal knowledge or on information I have gained in my official capacity.

2.  This declaration is provided in order to document the efforts DoD has undertaken to defend, on the merits, more than 250 habeas corpus proceedings filed by or on behalf of individuals detained by DoD at Guantanamo Bay, Cuba. DoD has taken unprecedented steps to marshal resources and develop appropriate procedures for gathering and reviewing information on these detainees, developing pertinent information into a factual return and receiving appropriate permissions to use that information in the habeas proceedings.

3.  As of today, DoD has approximately 30 attorneys working exclusively on habeas corpus litigation, including more than 20 attorneys who were diverted from other offices within DoD that provide legal advice to a variety of DoD organizations and components, some of which are located outside of the Washington, D.C. area. Each of these diverted attorneys is now working full-time on habeas corpus matters. Their offices have redistributed these attorneys' work to

other attorneys within the office, at a time when each office is supporting a DoD organization or component engaged in DoD's war mission. The first of these attorneys arrived in mid-July 2008, and additional attorneys have arrived during July and August. Furthermore, the Office of the General Counsel is in the process of hiring 40 attorneys who will replace these diverted attorneys, as well as additional administrative support staff.[1]

4.  The DoD attorneys described above work directly with attorneys from the Department of Justice. There is at least one attorney from each organization assigned to each detainee's factual return. This attorney team works together on reviewing the information and developing a factual return for the detainee.

5.  The DoD attorneys described above have been actively involved in gathering and reviewing information for potential use in the factual returns, including intelligence and law enforcement material which originated with DoD or other government agencies. (To assist these attorneys with this effort, DoD has diverted intelligence or other personnel from their other intelligence-related work (including personnel from the Joint Intelligence Group at Guantanamo), in order to have them work full-time on the habeas litigation.). When a document is proposed for inclusion in a factual return, it must then be reviewed to determine who originated the information contained within it. The originator may be a DoD organization or it may be another U.S. government agency, or an individual document may contain a combination of the two. Once the originator or originators are identified, permission must be sought from those organizations before DoD can use the information in a habeas corpus proceeding, similar to the process followed when information is being requested for use in criminal proceedings or for release under the Freedom of Information Act. During this review, the organization considers issues

---

[1]  DoD has also been standing up the infrastructure for these attorneys, including appropriating sufficient office space in the Washington, D.C. area for what will ultimately be more than 50 DoD attorneys and support staff.

such as the classification level of the information, the receiving party's security clearance and need to know the information, and the potential harm to sensitive methods or sources of intelligence that may be implicated by the information's use in the habeas proceeding. The originator of the information is the organization that is capable of making decisions about harm from dissemination and the release of the information in the habeas context.

6. To process information that originates with a DoD organization (and may be reflected in the narrative document that cites that information), DoD has created a multi-person team of personnel which is responsible for coordinating the process of seeking permission from the relevant DoD organization(s). For the documents identified to date, this team was required to coordinate with the following DoD organizations: United States European Command, United States Central Command, United States Pacific Command, United States Southern Command (which has cognizance over the detention facility at Guantanamo), United States Special Operations Command, the Criminal Investigation Task Force, the Defense Intelligence Agency, the National Security Agency, the National Geospatial-Intelligence Agency and the Department of the Army. Upon being contacted, personnel from each of these organizations reviewed the relevant documents, for the purpose of conducting the analysis described above. For some of the documents, this review resulted in a conclusion that another DoD organization or U.S. government agency had equities in the information being reviewed, thus requiring the document to be further coordinated.

7. Within the last 30 days, the team has coordinated the review of almost 1,900 documents that originated with DoD organizations (all of which are multi-page documents), in addition to expending a significant amount of time preparing supporting materials and coordinating them for

3

use in the litigation. Approximately 1,700 of those 1,900 documents were cleared by their DoD

originators for use in the habeas corpus proceedings. (The remaining 200 documents could not

be cleared by DoD as they contained some information that originated with other U.S.

government agencies and thus are undergoing further coordination.) Before being used in the

factual return, however, those 1,700 documents are also subject to review by the Central

Intelligence Agency, as discussed in its declaration being submitted to this court, for any equities

that organization may have in the material.

I declare under the penalty of perjury and the laws of the United States that the foregoing

statement is true and accurate to the best of my knowledge.

August 29, 2008                    Daniel J. Dell'Orto

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
IN RE:                              )
GUANTANAMO BAY            )          Misc. No. 08-442 (TFH)
DETAINEE LITIGATION        )
_____)

## DECLARATION OF GREGORY G. KATSAS

Pursuant to 28 U.S.C. § 1746, I, Gregory G. Katsas, hereby declare:

1. I am the Assistant Attorney General for the Civil Division of the United States

Department of Justice ("DoJ"). In that capacity, I am responsible for overseeing all litigation that

falls within the jurisdiction of the Division, as generally described in 28 C.F.R. § 0.45. I have

held supervisory positions in the Civil Division or the Office of the Associate Attorney General

("OASG"), which oversees the Civil Division, since June 2001.

2. The Civil Division is responsible for defending the Government in habeas corpus

cases brought by or on behalf of individuals detained as enemy combatants by the United States

Department of Defense ("DoD") at Guantanamo Bay, Cuba. The first of these cases was filed in

2002. Cases filed by or on behalf of over 250 Guantanamo detainees are currently pending

before various judges of this Court.

3. Until recently, the parties have had no occasion to litigate the merits of these cases.

Initially, the litigation focused on whether the general habeas corpus statute, 28 U.S.C. § 2241,

creates statutory jurisdiction over claims filed by the Guantanamo detainees. The lower courts

held that it does not, but the Supreme Court ultimately held that it does. See *Rasul v. Bush*, 542

U.S. 466 (2004). Following *Rasul*, the litigation focused on the Government's motions to

dismiss on other, purely legal grounds. One judge granted such motions in their entirety, see

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), while another judge granted them only in part, see *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). Merits proceedings in this Court were stayed during the ensuing appeals. Following initial briefing and argument in those appeals, the D.C. Circuit ordered one additional oral argument, and three rounds of supplemental briefing, to address the impact of one intervening Supreme Court decision and two intervening statutes. Ultimately, the D.C. Circuit held that the Military Commissions Act of 2006 validly repealed this Court's habeas jurisdiction with respect to the Guantanamo detainees, see *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), but the Supreme Court then reversed that decision, see *Boumediene v. Bush*, 128 S. Ct. 2229 (2008).

4. Until the Supreme Court decision in *Boumediene*, the Civil Division could take only limited steps to prepare for the defense of claims by the Guantanamo detainees. Under the holding of the D.C. Circuit, those claims would have been reviewed in the first instance by the D.C. Circuit, based on administrative records created by military tribunals, under the standards of review specified in the Detainee Treatment Act of 2005 ("DTA"). In contrast, under the holding of the Supreme Court, the Guantanamo detainee litigation is proceeding in district-court habeas actions, with the parties allowed to submit evidence beyond what was previously presented to military tribunals. In anticipation of the Supreme Court's *Boumediene* decision, the Civil Division secured a significant supplemental appropriation to fund the anticipated increased demands of the Guantanamo litigation. But until *Boumediene* was decided, the Division could not know whether to prepare for hundreds of appellate proceedings in the D.C. Circuit under the DTA (to be handled primarily by or under the supervision of our Appellate Staff) or hundreds of

district-court habeas proceedings in this Court (to be handled primarily by or under the supervision of our Federal Programs Branch).

5. After *Boumediene* was decided, DoJ moved quickly to secure the tangible and human resources necessary to handle the habeas litigation with expedition. As the Court is aware, by the end of June, we had committed to dedicating at least 50 attorneys to the litigation. That commitment in turn necessitated securing at least 30 detailees from outside the Civil Division, including from other litigating divisions within Main Justice and from United States Attorneys' Offices throughout the country. During my seven years in the Civil Division and OASG, I am unaware of any litigation matter in which any Assistant Attorney General has ever requested so many additional resources from outside his or her Division. Nonetheless, the Deputy Attorney General immediately approved my request, and a Department-wide initiative was undertaken to identify an appropriate team of attorneys, shift their existing responsibilities onto others, and secure for them the necessary facilities, training, and security clearances to begin work on the habeas litigation.

6. The Civil Division began converting workspace that had been set aside for the Guantanamo litigation even before our new attorneys began to arrive. Among other things, we needed to secure computers, copiers, and other infrastructure necessary to ensure the lawful and secure handling of classified information, including some sensitive compartmented information subject to particularly stringent handling requirements. Although the workspace can now support most of our expanded litigation team, further modifications and outfitting remain ongoing.

7. To date, DoJ has identified more than 50 attorneys to work on the Guantanamo habeas litigation. These include at least 10 attorneys from within the Federal Programs Branch of the

Civil Division, at least 10 attorneys detailed from other branches of the Civil Division at my direction, and at least 30 attorneys detailed from outside the Civil Division at the direction of the Deputy Attorney General. The first of our detailees arrived in July, and many more arrived throughout August. Once detailees are identified, it may take several weeks for them to obtain the necessary security clearances. Thus, although we now have almost 40 cleared attorneys working full-time on these cases, during the month of August, an average number of approximately 20 cleared attorneys were available. By late September, we expect to have at least 50 cleared attorneys working full-time on these cases.

8. DoJ attorneys are now actively engaged in the preparation of factual returns for the habeas litigation. The preparation of each individual return is a complex and time-consuming process that requires coordination among DoJ, DoD, and various constituents of the Intelligence Community. One important objective in this process is to develop the Government's best possible case to support the detention of each petitioner as an enemy combatant. However, because much of the relevant evidence is classified and extremely sensitive, another competing objective is to minimize the risk of harm from the disclosure of such information. Striking the appropriate balance between these objectives requires difficult, case-by-case and document-by-document judgments regarding the sensitivity of the particular classified document at issue, and the comparative strength of the draft factual return with and without the document.

9. In crafting a proposed factual return, DoJ and DoD attorneys begin by analyzing information about a detainee and by reviewing documents for information that supports the detention (or that is exculpatory, as we understand that term in this context). They then draft a narrative that summarizes the case for detaining the petitioner as an enemy combatant, with appropriate citations to the underlying documents. The creation of a draft factual return,

including the narrative and its supporting documents, consumes dozens of hours and involves

review of hundreds of pages of documents, and sometimes far more. Collectively, DoJ and DoD

attorneys have expended thousands of hours in developing these draft returns over the past two

months.

10. Once a proposed factual return has been drafted, DoJ attorneys then must secure

permission to include any classified information in the return from the agency with control over

the information at issue. Some of that classified information comes from DoD or the FBI, but

the majority of it comes from the Central Intelligence Agency ("CIA").

11. Final decisions about the contents of a factual return thus cannot be made until the

intelligence agencies, including the CIA, complete their review of the draft return. If an

intelligence agency refuses permission to use a key classified document included in the draft

return, DoJ attorneys must then re-evaluate the case, attempt to identify other sources of the

information, and determine an appropriate course of action. Sometimes, such a course of action

might involve submitting a return that is less compelling than it otherwise might have been.

Sometimes, it might involve asking the intelligence agency to re-assess its refusal in light of the

critical nature of the particular document to the particular case. Sometimes, in extreme

circumstances, it might involve abandoning our defense of a case.

12. To expedite the document clearance process, DoJ and DoD began sending exhibit

lists to the CIA in late July and early August. These lists indicated documents for possible

inclusion in individual draft returns. Shortly thereafter, on or about August 12, DoJ started to

send complete packets of draft factual returns on a rolling basis to the CIA for clearance. To

date, DoJ has completed, and sent to the CIA for clearance, 59 of these draft factual returns.

13.   This Court's deadline of 50 filed returns by today approximates the proposal made in my June 30, 2008 letter to Chief Judge Lamberth and Judge Hogan, in which the Civil Division proposed to file 50 returns within 60 days of that letter.  That proposal assumed (erroneously, as things turned out) that the clearance process would take a matter of days per return.  Based on the CIA's experience with the first several returns already filed by the Government, and for reasons explained at length in the public and ex parte declarations of General Hayden, the CIA has now determined that it needs 30 days per return to complete the clearance process without unacceptably compromising classified information and national security.  I apologize that our original proposal failed to anticipate the extent of difficulties in securing the necessary clearances for relying upon classified documents.

14.   Given the DoJ resources presently in place, I am confident that DoJ will be able to generate, in addition to the 59 draft factual returns that it has already sent to the CIA for clearance review or completed and filed in Court, additional draft returns at the rate of 50 per month.  Moreover, according to the public declaration of General Hayden, the CIA now believes that it can make clearance decisions on 50 draft returns per month, provided that it has 30 days per return.  For these reasons, I expect that the Government will be able to produce its first 50 factual returns, including those filed today, on a rolling basis before the end of September, and hope it will sustain a similar rate of production each month thereafter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2008.          _____
                                                          GREGORY G. KATSAS

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) MISC. No. 08-0442 |
| GUANTANAMO BAY DETAINEE LITIGATION | ) |

## DECLARATION OF MICHAEL V. HAYDEN, DIRECTOR, CENTRAL INTELLIGENCE AGENCY

I, MICHAEL V. HAYDEN, hereby declare and state:

1.   I am the Director of the Central Intelligence Agency (CIA) and have served in this capacity since 30 May 2006.  In my capacity as Director, I lead the CIA and manage the Intelligence Community's human intelligence and open source collection programs on behalf of the Director of National Intelligence (DNI).  I have held a number of positions in the Intelligence Community, including Principal Deputy Director of National Intelligence, from April 2005 to May 2006; Director, National Security Agency/Chief, Central Security Service (NSA/CSS), Fort George G. Meade, Maryland, from March 1999 to April 2005; Commander of the Air Intelligence Agency and Director of the Joint Command and Control Warfare Center, both headquartered at Kelly Air Force Base, Texas, from January 1996 to September 1997; and Director, Intelligence Directorate, U.S. European Command, Stuttgart, Germany, from May 1993 to October 1995.

2.    I was a four-star general in the United States Air
Force until my retirement from the Air Force on 1 July 2008 and
have held senior staff positions at the Pentagon, the National
Security Council (NSC), and the U.S. Embassy in Sofia, Bulgaria,
as well as serving as Deputy Chief of Staff for United Nations
Command and U.S. Forces Korea.  I entered active duty in 1969 as
a distinguished graduate of the Reserve Officer Training Corps
program.

3.    I make the following statements based upon my personal
knowledge and information provided to me in my official
capacity.

4.    The purpose of this declaration and my accompanying
classified declaration is to describe for the Court why the CIA
is experiencing delays in providing documents and information to
the Department of Justice (DOJ) and Department of Defense (DOD)
for use in habeas litigation.

I.    Purpose Of This Declaration

    A.    The Boumediene Decision

5.    Through the exercise of my official duties, I have been
advised of the U.S. Supreme Court's decision in *Boumediene v.
Bush*, 128 S. Ct. 2229 (2008), and its impact on the habeas
corpus litigation in the United States District Court for the
District of Columbia, which involves individuals detained by the
United States as alien enemy combatants at the U.S. Naval Base

Guantanamo Bay, Cuba. I understand that a majority of these
pending habeas petitions have been transferred to this Court for
initial rulings on common issues and administrative matters. I
also am aware that the Court has issued a scheduling order that
requires the Government to file fifty factual returns to the
habeas petitions per month until the Government has responded to
all of the petitions.

6. Since the *Boumediene* decision and the entry of the
Court's scheduling order, the CIA has worked diligently to
establish a process and devote the personnel resources necessary
to review the large volume of documents and information that the
Government proposes to include in its factual returns. In light
of the large quantity of cases and the very tight schedule, the
CIA has consolidated and streamlined the review process to the
maximum extent possible without sacrificing the care and
deliberation that must be employed to safeguard the national
security by protecting classified foreign intelligence sources
and methods from unauthorized disclosure. I have made it clear
to my senior managers that meeting the Court's schedule is a top
priority for the CIA. To that end, I have allocated additional
personnel to those components involved in the habeas review
process and have directed CIA managers to ensure that such

personnel have all the resources that they need.[1]  Despite this
effort, the CIA has not been able to complete its review of all
of the first fifty factual returns by 29 August 2008.  In this
declaration, I will describe the classified information
implicated by the habeas litigation, the purpose of the CIA
review process, the nature of the review process, and the delays
in completing that process for all fifty returns.

        7.   This unclassified declaration describes, to the extent
possible on the public record, the reasons for the delay in
completing all of the factual returns.  I respectfully refer the
Court to my classified declaration, which is submitted for the
Court's in camera, ex parte review because it contains
classified information that cannot be disclosed publicly in my
unclassified declaration.

        B.   CIA Information at Issue

        8.   Much of the information upon which DOD relied in making
its enemy combatant determinations and upon which DOJ proposes
to rely in its factual returns derives from classified CIA
intelligence reports.  CIA intelligence reports are classified
because they contain information that was clandestinely acquired
by the CIA; that is, information that is not available from any
other source.  CIA intelligence reports also are classified

---

[1] More than fifty CIA attorneys, paralegals, subject matter experts, and
classification officials are involved in the habeas review process.

4

because public disclosure of the information contained therein
would tend to reveal the clandestine intelligence activities,
sources, and methods by which the CIA collected the information.
Unauthorized disclosure of the classified information in CIA
intelligence reports reasonably could be expected to result in
damage to the national security, which includes defense against
transnational terrorism, that I describe in my classified
declaration.

9.   Before the CIA can authorize DOD and DOJ to include
classified CIA documents or information in the Government's
factual returns, the CIA must first determine whether disclosure
of such information to the Court, petitioners' counsel,
petitioners, or the public could be expected to damage the
national security.   This predictive judgment cannot be made on
an abstract basis.   Rather, such judgments must be made by
experienced intelligence professionals after review on a
document-by-document basis.   The classified CIA information
implicated by the habeas litigation falls broadly into three
categories:   a) foreign government information; b) foreign
relations and foreign activities of the United States; and c)
intelligence activities, sources, and methods;.   I will discuss
each of these categories of classified information in turn.

10.   First, much of the classified CIA information
implicated by the habeas litigation was provided to the CIA by

5

the intelligence or security services of foreign governments with whom the CIA has confidential intelligence-sharing agreements. Second, much of the classified CIA information implicated by the habeas litigation concerns the foreign relations and foreign activities of the United States. Finally, much of the classified CIA information implicated by the habeas litigation was collected through clandestine intelligence activities, sources, and methods.

C. Damage to the National Security

11. I recognize that the Court has not ordered any classified information to be publicly disclosed. Nevertheless, exceptionally grave damage to the national security reasonably could be expected to result if the CIA's deliberative review process for the disclosure of classified information is not followed during the habeas litigation.

12. I understand that more than 200 habeas petitions have been filed in the District Court. I also understand that each detainee typically is represented by several attorneys. As a result, the CIA documents cited in the Government's factual returns will be disclosed to several hundred private attorneys who are not employees of the U.S. Government and who are not trained in handling classified information. With so many untrained individuals allowed access to such sensitive information, I believe that unauthorized disclosures, even if

6

inadvertent, are not only probable, but inevitable.  The degree
to which access to much of the classified information implicated
by the habeas litigation is strictly controlled and limited to
only a small number of employees of the federal government is
described more completely later in my classified declaration.
The Executive order and agency regulations controlling access to
classified information recognize that limiting the number of
people with access to classified information is a necessary step
in safeguarding such information.  If the CIA does not follow
its rigorous review process for documents implicated by the
habeas litigation, the U.S. Government will not be able to
adhere to its carefully administered policy of compartmenting
its most highly sensitive information, which would unacceptably
increase the likelihood of unauthorized disclosures.

    13.  CIA subject matter experts, of whom there are a
limited number, must conduct a line-by-line review of documents
determined by DOD and DOJ to be pertinent to a petitioner's
status as an enemy combatant to determine whether the document
can be provided in redacted form to petitioner's counsel or if
it must be provided only to the Court, or possibly not at all.
As mentioned above, significant CIA personnel and resources have
been redirected to meet the Court's habeas schedule.  The
redirection of these resources is in an effort to attempt to
comply with the Court's habeas schedule.  Were the CIA to cut

corners in its review process or conduct the process without sufficient deliberation regarding important U.S. national security interests, it is very possible that intelligence sources and methods could be compromised and foreign relations disrupted. In that circumstance, there would be exceptionally grave damage to the national security of the United States, particularly to the CIA's primary goal of protecting the country from terrorist attacks.

## II. Classification Authority

14. The CIA was established by section 104(a) of the National Security Act of 1947 (the Act), as amended, 50 U.S.C.A. § 403-4. Section 104A of the Act, 50 U.S.C.A. § 403-4a, established the position of Director of the Central Intelligence Agency (DCIA), whose duties and responsibilities include serving as head of the CIA and collecting information through human sources and by other appropriate means; correlating and evaluating intelligence related to the national security and providing appropriate dissemination of such intelligence; providing overall direction for coordination of the collection of national intelligence outside the United States through human sources by elements of the intelligence community authorized to undertake such collection; and performing such other functions and duties related to intelligence affecting the national security as the President, or the DNI, may direct. A more

8

particularized statement of the authorities of the DCIA and the CIA is set forth in sections 1.6 and 1.7 of Executive Order 12333, as amended.[2]

15.    Section 102A(i)(1) of the Act, 50 U.S.C.A. § 403-1(i)(1), provides that the DNI shall protect intelligence sources and methods from unauthorized disclosure.  Under the direction of the DNI pursuant to section 102A, and in accordance with section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g, and section 1.6(d) of Executive Order 12333, as amended, the Director of the CIA is responsible for protecting CIA intelligence sources and methods from unauthorized disclosure.  The documents implicated by the habeas litigation contain information that, if disclosed, would tend to reveal intelligence sources and methods.

16.    In accordance with section 1.3(a)(2) of Executive Order 12958,[3] the President has authorized me to exercise original TOP SECRET classification authority.[4]  Pursuant to that authority, I have portion-marked each paragraph of my

---

[2] Exec. Order 12333, reprinted as amended in 50 U.S.C.A. § 401 note 24 (West. Supp. 2008) and revised by Exec. Order No. 13470, 73 Fed. Reg. 45325 (July 30, 2008).

[3] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292.  See Exec. Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 193 (West Supp. 2008).

[4] Order of President, Designation under Executive Order 12958, 70 Fed. Reg. 21,609 (Apr. 21, 2005), reprinted in U.S.C.A. § 435 note at 205 (West Supp. 2008).

classified declaration with the level of classification and
control markings necessary for the full protection of the
information in that paragraph. The marking "U" denotes
unclassified information; "S" denotes information classified at
the SECRET level because its unauthorized disclosure reasonably
could be expected to cause serious damage to the national
security; and "TS" denotes information classified at the TOP
SECRET level because its unauthorized disclosure reasonably
could be expected to cause exceptionally grave damage to the
national security. The portion-markings of each paragraph also
may identify whether additional dissemination or access controls
apply.

17. Section 4.3 of Executive Order 12958 provides that
certain senior U.S. officials are authorized to establish
"Special Access Programs" upon a finding that "the vulnerability
of, or threat to, specific information is exceptional" and "the
normal criteria for determining eligibility for access
applicable to information classified at the same level are not
deemed sufficient to protect information from unauthorized
disclosure." The Director of the CIA is authorized to establish
Special Access Programs for intelligence activities, sources,
and methods. Such intelligence programs are called "Sensitive
Compartmented Information Programs," or SCI Programs.

10

18.   The portion markings also contain the dissemination controls ORCON, or OC, and NOFORN, or NF.   ORCON (which stands for "Originator Controlled") means that the information cannot be further disseminated without authorization from the originating agency, in this case the CIA.   NOFORN (which stands for "No Foreign Dissemination") means that the information can be disseminated to U.S. persons only and cannot be disseminated to foreign nationals.

## III.  Review Process in Habeas Litigation

19.   The CIA did not receive the first draft factual returns until 12 August 2008, and received the last batch of factual returns as recently as 25 August 2008.   Nevertheless, the CIA managed to complete its review of a significant number of returns by the 29 August 2008 deadline.[5]   As a result of its initial efforts, the CIA expects to be able to complete its review of any particular factual return within thirty days of receipt of the draft return by the CIA.   With the benefit of increased production of draft factual returns by DOJ and lessons learned in completing its review of this initial set of returns, the CIA going forward expects to be able to increase its rate of completing reviews towards accommodating the Court's schedule of filing fifty factual returns per month.

---

[5] In addition to the factual returns filed in petitions pending before this Court, the Government also filed during August 2008 a number of factual returns in petitions pending before Judge Leon and Judge Sullivan.

11

IV.   Conclusion

20.   In my classified declaration, I have described the basis for my judgment that abandoning the rigorous deliberation of the CIA's review process for the habeas litigation reasonably could be expected to cause exceptionally grave damage to the national security by the disclosures of very sensitive information.  If the Court desires, I am willing to appear before the Court to provide additional information or answer any questions.  If my appearance is necessary, I request that the Court conduct the proceedings on an ex parte basis so that I can elaborate on the issues described in my classified declaration.

*   *   *   *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of August, 2008.

Michael V. Hayden
Director
Central Intelligence Agency

12